The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT WESTERN DISTRICT
OF WASHINGTON AT SEATTLE

DAVID EDMAN,

                Plaintiff,

      v.

KINDRED NURSING CENTERS WEST, L.L.C,

            Defendant.

No.  14-CV-01280 BJR

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT AND GRANTING
DEFENDANT'S MOTION TO
STRIKE PORTIONS OF THE
DECLARATION OF CAROLYN
CAIRNS

## I.       INTRODUCTION

Plaintiff David Edman filed suit against Defendant Kindred Nursing Centers West LLC,

d/b/a Kindred Nursing and Rehabilitation – Kindred ("Kindred"), alleging claims for failure to

accommodate, retaliation, disability discrimination, and wrongful withholding of wages,

pursuant to the Washington Law Against Discrimination ("WLAD") and the Wage Rebate Act

("WRA"). Defendant moves for summary judgment, seeking dismissal of all of Plaintiff's

claims. Defendant also brings a Motion to Strike the Declaration of Carolyn Cairns pursuant to

Federal Rule of Civil Procedure 37. After reviewing the briefs and all other relevant material properly before the Court, the Court will grant in part and deny in part the motion for summary judgment and grant the motion to strike. The reasoning for the Court's decision is set forth below.

## II.   BACKGROUND

The following facts are undisputed unless otherwise indicated. Plaintiff is HIV positive[1] and was diagnosed with the HIV-related cancer Kaposi's Sarcoma in October 2013.  Defendant is a nation-wide company operating a nursing facility in Shoreline, Washington, using the name Kindred or Arden. Plaintiff has worked for Defendant since July 2011.

During the time period relevant to this action, Plaintiff was Defendant's Food Services Manager, managing a team that provides Defendant's patients with specialized meals based on their medical needs and personal preferences.  Plaintiff was directly supervised by the executive director of the Arden facility.

In November 2012, Sandra Hurd became the executive director and, therefore, Plaintiff's direct supervisor.  Plaintiff disclosed his HIV status to Hurd in April 2013.  Hurd did not express any concerns to Plaintiff about his medical condition at that time.

By the summer of 2013, it was evident to Plaintiff and many of his colleagues that his health was deteriorating.  He was losing weight and his coworkers began approaching him to express their concerns about his health. Plaintiff also had several informal conversations with Hurd about his medical condition that summer.

---

[1] In his deposition, Edman testified that based on criteria set by the Centers for Disease Control and Prevention (CDC), his diagnosis was AIDS in 2012, but the same diagnosis would now be described as HIV 3.

Plaintiff believes that his declining health began affecting his behavior at work. On July 11, 2013, Hurd issued Plaintiff a written warning for two incidents involving loud arguments between Plaintiff and a nurse and between Plaintiff and one of Defendant's vendors.  When Hurd met with Plaintiff about the warnings, Plaintiff admitted to Hurd that he had raised his voice, but explained that he did so because he was ill, which affected his disposition.

    a. *State Survey and First Medical Leave*

Although Hurd had given Plaintiff the day off to keep the scheduled doctor's appointment, according to Plaintiff, Hurd called him on the morning of July 29 because the State Department of Health and Human Services ("DHHS") had arrived at the Kindred facility to conduct an unannounced annual survey.  Plaintiff further alleges that when Hurd called him, he told her that he was heading to a doctor's appointment and was feeling ill.  Plaintiff claims that Hurd responded by telling him that she needed him to report to work anyway.  In contrast, Hurd asserts that she called Plaintiff on the morning of July 29, but did not ask him to come to work. When Plaintiff arrived, Hurd claims she told him the staff could handle the survey without him.

After canceling his doctor's appointment, Plaintiff worked for the duration of the DHHS survey, which lasted from July 29 through August 6, 2013. During that week, one of the surveyors spoke to Hurd about Plaintiff, complaining that he was yelling at the staff and was "focused only on the timing of the meals and not the accuracy or quality." (Edman Dep. 1, Ex. 20 at ¶ 1; Hammond Decl., Hurd Dep.("Hurd Dep. 1"), Ex. C at 110:10-111:1). The surveyors also noted issues in the tray lines, which were under Plaintiff's purview.  In all, the surveyors found twelve deficiencies, with one in an area over which Plaintiff had control. Although ill, the parties agree that Plaintiff worked long hours throughout the week of the survey without asking for time off or accommodations for his illness.

After the survey ended, Plaintiff was able to reschedule his doctor's appointment with his primary care physician, Dr. Thomas Smith. During the appointment on August 8, 2013, Dr. Smith concluded that Plaintiff should immediately go on medical leave. Defendant approved the Plaintiff's request for leave and Plaintiff received short-term disability benefits. Plaintiff also requested, and was granted, a part-time schedule for the first two weeks he worked after returning from leave on October 1, 2013.

When Plaintiff returned from leave, he received a written warning and was placed on a "Performance Improvement Plan" ("PIP") for his behavior during the state survey. Plaintiff does not dispute the behavior described in the PIP, but in the "Employee Comments" section of his review he attributed his behavior to his illness: "My severe medical condition (HIV) caused a breakdown in my immune system…My disposition was directly effected [sic] by the multiple infections and lack of sleep." (Edman Dep. 1, 143:6-17).  Plaintiff alleges that in response to his explanation that his behavior was attributable to his illness, Hurd told him his poor health was "not an excuse." (Edman Dep. 1, 144:9-15).

Although Hurd did not meet with Plaintiff regarding the PIP until after he returned from medical leave, she testified that the decision to create a PIP for Plaintiff came seven weeks earlier, within a few days of the state survey but after Plaintiff requested leave.  Hurd claims she did not present Plaintiff with the PIP at the time she wrote it because she decided that "instead of stressing [Plaintiff] out more on his leave, he need[ed] to go take his leave and deal with his health, and then we'[d] address it when he c[ame] back." (Hurd Dep.1, 107:14-17). Plaintiff was the only employee disciplined as a result of the survey.

One manager who was not disciplined after the survey was Ansu Cham, the Director of Nursing, whose department received nine citations from DHHS. Plaintiff claims this proves that

Cham, who was also supervised by Hurd, received more favorable treatment.  Several months

after the survey, Cham was accused of yelling at a resident's family, conduct Plaintiff claims is

similar to his own behavior during the survey. Hurd testified that in response to the incident

involving the resident's family, she "had to call it in to the State and do a whole investigation on

it." (Cairns Decl., Hurd Dep. ("Hurd Dep. 2"), Ex. D at 179:20-21). Cham denied the conduct at

issue and had no history of discipline; he was suspended for one and a half days, but did not

receive a written warning or PIP like Plaintiff.

   b.  *Kaposi's Sarcoma*

   On October 18, 2013, Plaintiff was diagnosed with Kaposi's sarcoma.  Dr. Smith testified

this diagnosis qualified Plaintiff as disabled under the Social Security Act ("SSA"), meaning

Plaintiff could have applied for and received disability benefits. (Hammond Decl., Smith Dep.

("Smith Dep. 1"), Ex. E at 92:19-20). Dr. Smith also testified that Plaintiff was capable of

working with certain accommodations for his disability. (Cairns Decl., Smith Dep. ("Smith Dep.

2"), Ex. B, at 96:3-11). Plaintiff did not apply for disability benefits, but instead continued to

work for several weeks after his cancer diagnosis.

   On October 29, Plaintiff requested a number of temporary accommodations intended to

allow him to work while he underwent treatment for his cancer. Plaintiff also requested

intermittent leave pursuant to the Family Medical Leave Act (FMLA).  According to Plaintiff,

when he presented his accommodation request to Hurd, she responded: "No, I can't do this.

David, you still have to do your job." (Plaintiff Dep. 1, 154:1-2).

   On October 31, Plaintiff met with Hurd and Defendant's Human Resources Director,

Elaine Revelle.  During the meeting, Hurd and Revelle explained to Plaintiff that Defendant

would be unable to immediately provide the accommodations he requested.  Plaintiff was then placed on unpaid leave and told to exit the building without finishing his shift.

   c.   *Communications During Plaintiff's Leave*

Plaintiff emailed Revelle on November 5, 6, 7, and 11, 2013, asking her to hasten her review of his accommodation requests because he was without financial resources. Revelle wrote to Plaintiff on November 6 to update him on the status of his FMLA request, and again on November 11 to request additional information regarding Plaintiff's accommodation requests. On November 14, Dr. Smith submitted a medical form to Defendant, certifying that Plaintiff was able to work with some accommodations in place.

On November 22, Revelle wrote to Plaintiff agreeing to grant some of his accommodation requests and inviting him to return to work.  Revelle also explained that Plaintiff would be required to cook twice a week when he returned to work. Although cooking was included in his original job description, this was the first time Plaintiff was tasked with cooking in the more than two years he worked for Defendant.  Hurd testified that adding cooking to the scope of Plaintiff's tasks at this point was necessitated by budget cuts and an analysis of Defendant's labor needs.

On December 9, 2013, in response to a conversation with Plaintiff's counsel, Defendant agreed to grant Plaintiff additional accommodations.  Defendant would allow Plaintiff to eat lunch in his office with his door closed, and Plaintiff was temporarily excused from interviewing residents.

However, Defendant denied Plaintiff's other accommodation requests, including: a temporary moratorium on changing Dining Services Department operations, staffing or duties,

6

two weeks' notice of any changes in the Dining Services Department that would require additional services or education, and additional time to resolve resident grievances. Defendant also refused Plaintiff's request to transfer to a position in the Central Supply Department, a position that would not require cooking. Instead, Defendant offered to remove cooking from the scope of Plaintiff's job duties, but only if Plaintiff accepted part-time status.

In response to Defendant's December 9 letter, Plaintiff emailed his attorney, stating that he had been "tossing and turning all night" and wanted to resolve his employment with Defendant through a settlement agreement that he termed a "bronze parachute." (Plaintiff Dep. 1, Ex. 31). On December 10, Plaintiff conveyed an offer to Defendant, whereby he would resign in exchange for certain compensation and fees; Defendant declined the offer on December 11.

Plaintiff expressed reluctance about returning to work throughout his leave. In an email to a friend on December 11, Plaintiff wrote: "I REALLY don't want to go back to Kindred." (Edman Dep. 1, Ex. 32). Plaintiff also applied for a job with Southwest Airlines during his leave. (Edman Dep. 1, Ex. 33). In an email to friends and family, Plaintiff cited the "adversarial position taken by [his] employer when [he] asked for accommodations to receive [] radiation therapy," as his motivation for seeking "employment elsewhere." (Edman Dep.1, Ex. 33).

Between December 11, when Defendant declined Plaintiff's settlement proposal, and December 31, 2013, Plaintiff, Dr. Smith, Hurd, and Revelle traded communications regarding the logistics of Plaintiff's return to work. On January 3, 2014, Dr. Smith released Plaintiff to work with several accommodations that had been previously discussed with Defendant. These accommodations included: (1) Intermittent FMLA leave on an as-needed basis; (2) an uninterrupted thirty-minute lunch that Plaintiff would eat in his office with the door closed; (3) eight business days' notice prior to the deadline for any assessment surveys or any planned event

or staffing modification; (4) an effort by all parties to keep stress levels low; and (5) adequate rest between scheduled shifts.

    d.  *Plaintiff's Return to Work*

On January 6, 2014, Plaintiff returned to work on a full-time basis. Plaintiff claims that his accommodations were not faithfully executed when he returned from leave. He testified that his lunches were frequently interrupted because he was not permitted to eat in his office with a sign on his door, sometimes he would not receive eight days notice of upcoming deadlines, and Hurd was often unavailable for scheduled meetings. Plaintiff also claims he was required to stay late and come in early the next morning, leaving him with little time to rest between shifts.

Shortly thereafter, Plaintiff's health began to deteriorate once again. In April, 2014, four months after he returned from leave, Plaintiff told Dr. Smith that the addition of cooking to his usual duties caused him significant exhaustion. One month later, Plaintiff reported to Dr. Smith that his work schedule was onerous. Dr. Smith noted that Plaintiff's fatigue was relapsing, and Plaintiff's blood tests revealed a loss of control over his HIV. Dr. Smith believes Plaintiff's "stress at work was a contributing factor to his immune destabilization." (Smith Decl, ¶ 15-16.).

In June 2014 Plaintiff was taken off the PIP during a meeting with Hurd. Hurd testified that towards the end of the period Plaintiff was on the PIP, he "really started to come out and excel."  (Hurd Dep. 1, 172:21-22). Hurd further testified that Plaintiff's "kitchen looked good, and he had a great survey. It went really well." (*Id*. at 173:4-5). In April, 2015, Plaintiff suffered a work-related injury; he is now on medical leave.

Plaintiff claims that Defendant failed to provide him with reasonable accommodations, retaliated against him for requesting accommodations, discriminated against him on the basis of his disability, and wrongfully withheld his wages. Defendant seeks summary judgment on all claims.

## III.    DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate where there is no genuine dispute as to any material fact and where the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 249 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 253. Summary judgment is often inappropriate in discrimination cases because the WLAD "mandates liberal construction and the evidence will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." *Johnson v. Chevron U.S.A., Inc*., 159 Wn. App. 18, 27, 244 P.3d 438 (2010) (citations omitted).

### B.    Failure to Accommodate (WLAD)

In order to establish a claim that an employer failed to provide reasonable accommodations under the Washington Law Against Discrimination (WLAD), a plaintiff must show: (1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the abnormality

and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and reasonably necessary to accommodate the abnormality. *Riehl v. Foodmaker, Inc.*, 152 Wash.2d 138, 145, 94 P.3d 930 (2004). An employer must reasonably accommodate a disabled employee unless the accommodation would pose an undue hardship to the employer. *Id*.; RCW 49.60.180(2).

For the purposes of summary judgment, Defendant does not dispute the first and third elements of Plaintiff's accommodation claim (*i.e*., that Plaintiff is disabled under the WLAD and he provided notice to Defendant of his disability and accompanying substantial limitations). However, Defendant contends that Plaintiff cannot satisfy the second and fourth elements of an accommodation claim. Specifically, Defendant argues that Plaintiff's accommodation claim must fail because Plaintiff was not qualified to perform the essential functions of his job, and because Defendant reasonably accommodated Plaintiff. (Dkt. 57, 16-17).

    a.   *Qualifications to Perform Essential Job Functions*

In order to pursue a failure to accommodate claim, a plaintiff must demonstrate that he is capable of performing the essential functions of his job. *Davis v. Microsoft Corp*., 149 Wn.2d 521, 532, 70 P.3d 126 (2003). Defendant asserts that Plaintiff was not capable of performing the essential functions of his job because Dr. Smith testified that his Kaposi's Sarcoma was a disability within the meaning of the Social Security Act (SSA). Defendant relies on case law providing that a plaintiff who has certified in an application for Social Security Disability benefits that he is unable to work, may not also pursue a failure to accommodate claim without presenting evidence explaining the apparent contradiction between those two claims. *Cleveland*

*v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999); *Atkinson v. Les Schwab Tire Centers of Washington, Inc.*, 180 Wn. App. 1050, 2014 WL 1746110, at *9 (2014).

Defendant's argument is misplaced. Contrary to what Defendant suggests, Plaintiff did not apply for Social Security Disability benefits, nor does Defendant present evidence that Plaintiff has ever claimed to be unable to work. To the contrary, Dr. Smith's testimony demonstrates that Plaintiff was able to work, so long as he received accommodations. (Smith Dep. 93:19-20) (stating that Plainitff was willing and able to work with some accommodations in place). Indeed, Plaintiff did perform his essential job functions both before and after the diagnosis. Plaintiff was working without any accommodations at the time of his Kaposi's Sarcoma diagnosis—and for the two weeks following his diagnosis—before he was placed on leave. Contrary to Defendant's assertion, this Court concludes that there is sufficient evidence for a reasonable jury to conclude that Plaintiff was able to perform the essential functions of his job.

   b.   *Reasonable Accommodations*

An employer is required to reasonably accommodate a disabled employee unless the accommodation would pose an undue hardship to the employer. A reasonable accommodation must allow the employee to perform the essential functions of her job without suffering substantially limiting symptoms. *Chevron*, 159 Wash.App. at 30. However, there is no requirement that an employer eliminate essential job functions or provide the precise accommodation requested by the employee. *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 778-79, 249 P.3d 1044 (2011). Where multiple potential modes of accommodation exist, the employer is entitled to select the mode; the employee is not. *Id*. at 778. Whether an

accommodation is reasonable is generally a question of fact reserved for the jury at trial. *Chevron*, 159 Wash.App. at 30.

Defendant asserts that it is entitled to summary judgment because it provided reasonable accommodations for Plaintiff as a matter of law. (Dkt. No. 57, 16). Plaintiff, on the other hand, contends that any accommodations Defendant provided were ineffective and that Defendant failed to meaningfully engage in the "interactive process" to address the inefficacy of the accommodations.

As discussed above, Plaintiff sought accommodations that would reduce the stress and exhaustion brought on by his HIV and Kaposi's sarcoma. To that end, Plaintiff sought both general accommodations such as  receiving time for "adequate rest" and keeping "stress levels as low as possible," as well as more specific accommodations such as an uninterrupted thirty-minute lunch period and weekly meetings with Hurd. (Edman Dep. 1, Ex. 39, ¶¶ 4, 6-8).

Plaintiff has presented evidence that the accommodations afforded him were ineffective, and that the cumulative effect of his employment arrangement left him with worsening symptoms. For instance, he testified that his lunches were often interrupted because he was not permitted to put a "do not disturb" sign on the door of his office. He further testified that his weekly meetings with Hurd often did not occur and that this caused him stress, which, in turn, affected his immune system.  Plaintiff also testified that he was sometimes required to work late into the evening and then again early the next morning, thereby leading to exhaustion.

In May 2014, four months after Plaintiff returned to work, Dr. Smith noted that Plaintiff was experiencing "immune system destabilization," which Dr. Smith attributed to stress caused by Plaintiff's job. (Smith Decl., ¶¶ 9, 10). Blood tests showing an increase in certain markers of HIV infection supported Dr. Smith's assessment that Plaintiff's condition was deteriorating. *Id*.

Plaintiff claims that he spoke with Hurd about the inadequacy of some of the accommodations, such as his frequently interrupted lunches and the missed weekly meetings. There is no evidence that Defendant responded to Plaintiff's complaints, nor does Defendant argue that it took any affirmative steps to verify the efficacy of Plaintiff's accommodations upon his return to work.

The Court concludes that Plaintiff has raised a triable issue of fact as to whether Defendant provided reasonable accommodations. Therefore, Defendant's motion for summary judgment on Plaintiff's failure to accommodate claim is denied.

## C.    Retaliation (WLAD)

To establish a prima facie case of retaliation under the WLAD, a plaintiff must show: (1) he engaged in a protected activity; (2) defendant took an adverse employment action; and (3) retaliation was a substantial factor behind the adverse employment action. *Sims v. Lakeside Sch.*, 2008 WL 2811164, at *3 (W.D. Wash. July 16, 2008). Washington courts apply the *McDonnell Douglas* burden-shifting framework to WLAD retaliation claims. *Daniel v. Green*, 411 U.S. 792 (1973); *Dumont v. City of Seattle*, 148 Wn. App. 850, 862, 200 P.3d 764 (2009). Under this framework, if the plaintiff has established a prima facie case, the burden of production shifts to the defendants to advance legitimate, nonretaliatory reasons for any adverse actions taken against the plaintiff. *Sims*, 2008 WL 2811164, at *3. The plaintiff then has the ultimate burden of showing the defendant's proffered reasons are pretextual. *Id*. Once the record contains reasonable but competing inferences of both discrimination and nondiscrimination, it is for the jury to choose between the competing inferences. *Boyd v. State, Dep't of Soc. & Health Servs.*, 187 Wn. App. 1, 12, 349 P.3d 864 (2015).

The parties do not dispute that Plaintiff engaged in protected activity by making requests for accommodations, including his request for medical leave in August 2013 and his request for reasonable accommodations for his Kaposi's sarcoma. Therefore, this Court must only determine if there is a triable issue of fact as to whether Defendant took an adverse employment action and, if so, whether retaliation was a substantial factor behind the adverse action.

a. *Adverse employment actions*

An adverse employment action is an action that a reasonable employee would find materially adverse. *Burlington Northern & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Whether a particular action would ordinarily be viewed as adverse by a reasonable employee is a question of fact appropriate for a jury. *Boyd*, 187 Wn. App. at 13-14. At the summary judgment stage, the Court need only determine whether Plaintiff has presented substantial evidence for the jury to find that Defendant's action would have dissuaded a reasonable worker from making or supporting a charge of unlawful conduct by Defendant. *Id.*; *Burlington*, 548 U.S. at 57.

Plaintiff alleges that he was subject to three adverse employment actions: (1) the receipt of a written warning and Performance Improvement Plan ("PIP"), (2) placement on unpaid administrative leave, and (3) the addition of cooking duties to his weekly tasks. (Dkt. 60, 23). Defendant does not challenge Plaintiff's contention that placement on a written warning and PIP are adverse employment actions. (*See* Dkt. 57, 19-20); *See also Coburn v. PN II, Inc*., 372 Fed. Appx. 796, 801 (9th Cir. 2010) (finding an adverse action where an employee was placed on a PIP for disciplinary reasons). However, Defendant argues that Plaintiff's placement on unpaid leave was not an adverse employment action, but rather a reasonable accommodation. Defendant also contends that the addition of cooking duties to Plaintiff's schedule was not

adverse because cooking was included in Plaintiff's job description and was "not an uncommon responsibility" for a Dietary Service Manager such as Plaintiff.

Plaintiff has presented substantial evidence for the jury to find that Defendant's actions would have dissuaded a reasonable worker from requesting disability accommodations. Plaintiff's suspension without pay could certainly dissuade a reasonable employee from requesting disability accommodations. *Boyd*, 187 Wn. App. at 14 (suspension for two weeks without pay constituted evidence of adverse action for the jury). Likewise, a reasonable employee could also consider the addition of cooking duties materially adverse. While the addition of work alone does not usually rise to the level of an adverse employment action, the lack of an accompanying increase in pay or decrease in other work to accommodate the additional work could dissuade a reasonable employee in Plaintiff's position from requesting further accommodation. *Wade v. Premera Blue Cross*, 2012 WL 12790, at *6 (E.D. Wash. Jan. 4, 2012); *Burlington*, 548 US. at 71. Therefore, the Court concludes that there is sufficient evidence for the jury to find that Defendant took an adverse action against Plaintiff.

b. *Retaliation must be a substantial factor*

Having demonstrated that a reasonable jury could find that Defendant acted adversely towards Plaintiff, he now must demonstrate that retaliation was a substantial factor behind the adverse employment actions. *Scrivener v. Clark Coll.,* 181 Wn.2d 439, 444, 334 P.3d 541 (2014). A "substantial factor" means that the protected action was a significant motivating factor bringing about the employer's decision. *Id.* at 444. "A factor supporting the decision is 'substantial' if it so much as tips the scales one way or the other." *Sims*, 2008 WL 2811164, at *6 (citation omitted). A plaintiff can establish that the employer acted with an improper motive

if there is "'[p]roximity in time between the adverse action and the protected activity, coupled with evidence of satisfactory work performance and supervisory evaluations[.]'" *Id.* (quoting *Kahn v. Salerno*, 90 Wash.App. 110, 131-32, 951 P.2d 321 (1998)).

Here, Defendant has admitted that Plaintiff was placed on unpaid leave precisely because he requested accommodations. (Dkt. 57, 19). Further, even if Defendant had not made this admission, the temporal proximity between Plaintiff's request for medical leave and Hurd's decision to give him a written warning and PIP—less than two days—creates a triable issue as to whether retaliation was a substantial factor in the decision to discipline Plaintiff. (Hurd Dep. 1, 107:8-9); *Scrivener*, 181 Wn.2d at 444. Likewise, the addition of cooking duties to Plaintiff's weekly schedule for the first time in Plaintiff's two year employment, three weeks after Plaintiff requested accommodations, is enough to create an inference of retaliation. (*See* Cairns Decl., Ex. V; Hurd Dep. 1, 151:7-11); *Burlington*, 548 U.S. at 71.

The Court concludes that Plaintiff has met his initial burden of showing that a prima facie case for retaliation exists under the WLAD.  The Court now turns to whether Defendant has shown that it had legitimate reasons for giving Plaintiff a written warning and PIP, placing him on unpaid leave, and adding cooking duties to his weekly tasks.

        c.  *Nondiscriminatory Explanation*

To satisfy the burden of production after a plaintiff presents a prima facie case, "the employer must articulate a legitimate nonpretextual nonretaliatory reason for the [adverse employment action]." *Sims*, 2008 WL 2811164, at *7. The employer must produce relevant admissible evidence of another motivation, but the burden is of production, not persuasion. *Id.*

Here, Defendant offers the following non-discriminatory reasons for placing Plaintiff on unpaid leave. First, Defendant argues that Plaintiff was given a written warning and PIP because of Plaintiff's conduct during the state survey, conduct that Plaintiff does not deny.  The conduct—raised voice, perceived hostility towards staff—was similar to conduct for which Plaintiff had been previously disciplined. Second, Defendant argues that had Plaintiff continued working without the parties first agreeing to the right set of accommodations, the law would have "severely penalized [Defendant] for requiring an employee to work outside his limitations." (Dkt. 57, 19). To this end, Defendant presented evidence that it was gathering information from Plaintiff and Dr. Smith about Plaintiff's need for accommodations and communicating with Plaintiff's attorney throughout his leave. Third, Defendant presented evidence that the inclusion of cooking in Plaintiff's job responsibilities was necessitated by business-related labor cuts.

Based on this evidence, the Court finds that Defendant has articulated legitimate and nondiscriminatory reasons for giving Plaintiff a written warning and PIP, placing him on unpaid leave, and adding cooking duties to his job responsibilities such that a reasonable jury could infer that Defendant was not retaliating against Plaintiff.


a.   *Pretext*

Because Defendant has produced evidence of a legitimate basis for the adverse employment action, the burden shifts back to Plaintiff to offer evidence that Defendant's articulated reason is pretextual. *Sims*, 2008 WL 2811164, at *8. At summary judgment, an employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor

motivating the employer." *Scrivener*, 181 Wn.2d at 446–47. An employee does not need to disprove each of the employer's articulated reasons to satisfy the pretext burden of production. *Id*. at 447.  Courts should look to the cumulative evidence, and therefore consider indirect with direct evidence to the extent that both are available. The appropriate inquiry at this stage is whether Plaintiff, at the very minimum, can establish pretext; a burden he can meet through indirect evidence that suggests Defendant is offering inconsistent or contradictory reasons for its adverse employment action. Plaintiff has made this showing.

Plaintiff points to the proximity in time of each of the adverse actions to Plaintiff's protected activity and inconsistencies in Plaintiff's performance reviews that demonstrate an attempt to highlight poor performance at the expense of the positive. (Dkt. 60, 22). While timing alone is not evidence of pretext, taken cumulatively with the other evidence, the timing of the three adverse actions, each on the heels of Plaintiff's accommodation requests, support an inference of pretext. *Dean v. Avis Budget Car Rental*, LLC, 2011 WL 1790461, at *7 (W.D. Wash. May 10, 2011).

Plaintiff has also offered evidence of inconsistencies in Defendant's explanations for its actions.  In one case, Hurd noted a bad score on a mock survey in an update to Plaintiff's PIP, when a more recent score was significantly better but went unnoted. (Dkt. 60 at 22). And while Defendant explained its decision to place Plaintiff on leave was a necessary step in the accommodation process, Defendant was unable to point to any other incident where an employee who was willing and able to work, was placed on involuntary, unpaid leave other than for disciplinary reasons. (*See* Cairns Decl., Ex. Q, 7-8).  In other words, Defendant's stated reason for placing Plaintiff on immediate, unpaid leave are inconsistent with Defendant's own policies and ordinary course of conduct.

Ultimately, if all burdens have been met and there are competing reasonable inferences, both discriminatory and nondiscriminatory, then a jury must decide the question. *Sims*, 2008 WL 2811164, at *10.  Here, both parties have met their respective burdens within the retaliation framework, and both parties have offered evidence sufficient to raise competing inferences. Therefore, the ultimate question of whether Defendant retaliated against Plaintiff for requesting accommodations is a question for the jury.  Consequently, the Court finds it inappropriate to grant Defendant's motion for summary judgment on Plaintiff's retaliation claim.


**D.**      **Disability Discrimination (WLAD)**

The *McDonnell Douglas* framework also applies to Plaintiff's disability discrimination claim. *Sims*, 2008 WL 2811164, at *10. To establish a prima facie case of disability discrimination, the plaintiff must demonstrate: (1) he belongs to a protected class; (2) he experienced an adverse employment action; (3) he was treated less favorably than a similarly situated, nonprotected employee (comparator); and (4) he and the comparator were doing substantially the same work.  *Id*.  In opposing summary judgment, an employee's evidentiary burden in establishing a prima facie case is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 658 (9th Cir. 2002). In the instant case, Defendant does not dispute that Plaintiff is a member of a protected class. And, as established above, the Court finds that Plaintiff has produced sufficient evidence to create a genuine issue of material fact as to whether he suffered adverse employment actions. Therefore, the only remaining issue is whether Plaintiff has properly identified a comparator.

Plaintiff points to the Director of Nursing, Ansu Cham, as a similarly-situated, nondisabled comparator.  Cham's department received several citations during the state survey,

while Plaintiff's department only received one, yet Cham was not disciplined for the results of the survey. Cham did not receive a written warning or PIP for allegedly yelling at a resident's family several months after the survey, conduct that was serious enough to warrant a report to the State and an investigation. Cham was suspended for one and a half days, but received no additional discipline. Like Plaintiff, Cham is a manager and is supervised by Hurd, yet, Plaintiff argues, Cham was not disciplined for conduct that was substantially similar to his.

In determining whether a similarly situated, nonprotected employee exists, "[t]he critical question is whether the plaintiff and the other employee are similarly situated in all material aspects." *Sims*, 2008 WL 2811164, at *11 (citation omitted). The similarly situated analysis is stringent, but that does not mean that the employees must be identically situated. *Blair v. Alaskan Copper & Brass Co.*, 2009 WL 2029963, at *7 (W.D. Wash. July 10, 2009); *Sims*, 2008 WL 2811164, at *11. Overall, the comparator must have a situation sufficiently similar to plaintiff's "to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Sims*, 2008 WL 2811164, at *11.

Defendant argues that Cham cannot be a comparator because, unlike Plaintiff, Cham "denied he engaged in the conduct alleged and he had no history of discipline." (Dkt. 62, ¶ 1). Defendant further contends that Plaintiff has no legitimate comparator because his was the only conduct specifically noted as inappropriate by the state surveyors.

Ultimately, however, all inferences must be drawn in favor of the nonmoving party, and, considering those inferences, Plaintiff has met his "minimal" burden to establish a prima facie case of disability discrimination under the WLAD.

Because the burden-shifting approach established by *McDonnell Douglas* and applied to Plaintiff's retaliation claim above also applies to Plaintiff's disability discrimination claim, the

Court finds it unnecessary to repeat the analysis here. The Court finds that Plaintiff met his

ultimate burden of production in showing that Defendant's reasons for giving Plaintiff a written

warning and PIP, placing him on unpaid leave, and adding cooking duties to his work load when

he returned from leave were pretextual.  The Court also denies Defendant's motion for summary

judgment as to Plaintiff's disability discrimination claim.


E.      **Wrongful Withholding of Wages**

Plaintiff alleges that by forcing him to take unpaid leave, Defendant wrongfully and

willfully withheld his wages in violation of RCW 49.48.010, 49.52.050 and 49.52.070. (Cmplt.

6, ¶ 34). In turn, Defendant argues that RCW 49.48.010 only "applies to wages to be paid upon

termination," and Plaintiff was never terminated. (Dkt. 57, at 23). Defendant also argues that

RCW 49.52.050 and .070 are inapplicable because Plaintiff's double damages claim under these

statutory provisions is solely based on his allegations that Defendant violated the WLAD. ( *Id*.;

Dkt. 62, at 14).

Washington law allows double damages as a civil remedy against any employer who

"wilfully and with intent to deprive the employee of any part of his wages, pays the employee a

lower wage than the wage such employer is obligated to pay by any statute, ordinance, or

contract." RCW 49.52.050(2); *Allstot v. Edwards*, 114 Wash.App. 625, 632, 60 P.3d 601 (2002).

For the purposes of the statute, "wages" may include backpay owed for wrongful termination,

but do not include retrospective jury awards for violation of the WLAD, as damages are not

wages the employer was "obligated" to pay. *Id*.; *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174,

1203 (9th Cir. 2002).  Washington's wage statutes are to be liberally construed to advance the

legislature's intent to protect employee wages and assure payment. *Schilling v. Radio Holdings, Inc.* 136 Wash.2d 152, 159, 961 P.2d 371(1998).

As a preliminary matter, Plaintiff cannot proceed with a claim under RCW 49.48.010 because the statute does not apply beyond the context of termination. The statute provides, in relevant part, "When any employee shall cease to work for an employer, whether by discharge or by voluntary withdrawal, the wages due him or her on account of his or her employment shall be paid to him or her at the end of the established pay period." RCW 49.48.010; *Lawson v. City of Seattle*, 147 Wn. App. 1008, 2008 WL 4695732, at *6 (2008) (citing *Champagne v. Thurston Cty.*, 163 Wn.2d 69, 89, 178 P.3d 936 (2008) (RCW 49.48.010 does not apply beyond the context of termination). It is undisputed that Plaintiff was employed by Defendant during his unpaid leave and was never terminated.  Therefore Plaintiff may not proceed with any claim under RCW 49.48.010.

Plaintiff also cannot establish a claim under RCW 49.52.050 or 49.52.070, because he has failed to produce any evidence demonstrating that Defendant's conduct was willful. "By their own terms, sections 49.52.050(2) and 49.52.070 of the Revised Code of Washington apply only where the nonpayment of wages is conducted 'willfully and with intent to deprive the employee of any part of his wages.'" *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1050 (9th Cir. 1995) (quoting RCW 49.52.050(2)). Therefore, the nonpayment must be the result of knowing and intentional action by the employer, rather than of a bona fide dispute as to the obligation of payment. *Schilling*, 136 Wn.2d at 160; *See e.g.*, *Moran v. Stowell*, 45 Wash.App. 70, 81, 724 P.2d 396 (defendant's obligation to reimburse the plaintiffs for accrued sick leave was fairly debatable-no double damages), *review denied*, 107 Wash.2d 1014 (1986). Dismissal of

such claims on summary judgment is permitted when there is no evidence that the employer

acted willfully. *Schilling*, 136 Wn.2d at 161.

In the instant case, there is a bona fide dispute about the propriety of placing Plaintiff on

unpaid leave while Defendant gathered information regarding Plaintiff's accommodation

requests. In support of its decision to place Plaintiff on unpaid leave, Defendant contends it was

unable to immediately accommodate Plaintiff but would have faced legal liability had it allowed

Plaintiff to continue working without accommodations. (Dkt. 57, 19). Plaintiff has produced no

countervailing evidence. Therefore, Plaintiff has not sustained his burden on summary judgment

with respect to his claim for violations of RCW 49.52.050 and 49.52.070. Defendant's motion

for summary judgment is granted with respect to Plaintiff's claim for wrongful withholding of

wages.

## IV.    Motion to Strike

Defendant moves to strike portions of the Declaration of Carolyn Cairns submitted in

support of Plaintiff's Opposition. (Dkt. No 61). Where a party, without substantial justification,

fails to disclose a witness in accordance with Rule of Civil Procedure 26(a), the party may not

present testimony from that witness, unless the error was harmless. Fed. R. Civ. P. 37(c)(1);

*Galentine v. Holland Am. Line-Westours, Inc*., 333 F. Supp. 2d 991, 993 (W.D. Wash. 2004).

Plaintiff's counsel, Carolyn Cairns, was not included on the witness list in this matter but

submitted testimony regarding her personal interactions with Defense counsel, in support of

Plaintiff's Opposition. Defendant now seeks to strike this testimony, specifically paragraph five

of the Cairns' declaration. Plaintiff has not provided any justification for the failure to disclose

Cairns as a witness.[2] Defendant's Motion to Strike paragraph five of the Declaration of Carolyn Cairns is granted.

## V.   CONCLUSION

For the foregoing reasons, the Court HEREBY GRANTS in part and DENIES in part Defendant's motion for summary judgment [Dkt. No. 57] and GRANTS Defendant's motion to strike [Dkt. No. 62].

Dated this 21st day of November, 2016.

Barbara Jacobs Rothstein
U.S. District Court Judge

---

[2] And as it happens, Cairns' testimony was unnecessary to the resolution of this matter.